UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                              CRIMINAL ACTION NO. 2:12-00216

MARCUS WYN TAYLOR

MEMORANDUM OPINION AND ORDER

        Pending are defendant Marcus Wyn Taylor's motion to
suppress evidence, filed December 13, 2012, supplemental motion
to suppress evidence, filed December 27, 2012, and second
supplemental motion to suppress evidence, filed January 14,
2013.

        On January 22 to January 24, 2013, the court held an
evidentiary hearing attended by counsel for the parties and Mr.
Taylor.  On February 1, 2013, Mr. Taylor moved to file
additional briefing and to supplement the record.  On February
4, 2013, the court permitted the parties to file additional
briefing respecting the mobile phone records at issue in the
case, with the final brief arriving on February 15, 2013.

        On February 26, 2013, after having not earlier
received a substantive response from the United States
respecting Mr. Taylor's February 6, 2013, brief, the United
States was directed to file a substantive response on or before

March 11, 2013, with any response from Mr. Taylor filed by March 18, 2013. On March 18, 2013, the final brief was received, and the court deemed the matter submitted.

On March 26, 2013, the Supreme Court entered its decision in <u>Florida v. Jardines</u>, No. 11-564, --- S. Ct. ----, 2013 WL 1196577 (U.S. Mar. 26, 2013), which, in combination with the recent decision in <u>United States v. Jones</u>, 132 S. Ct. 945 (2012), bore directly upon the issues under consideration in this action. The court noted that the United States had not responded to Mr. Taylor's earlier invocation of <u>Jones</u>. Accordingly, on April 3, 2013, the court directed the parties to submit cross briefs no later than April 12, 2013, respecting the application of both <u>Jones</u> and <u>Jardines</u> to this matter, with responses thereon filed no later than April 19, 2013. Those dates were extended, at the United States' request, to April 16, 2013, for cross briefs and April 21, 2013, for responses.

The court now enters its findings of fact and conclusions of law.

I.


Detective Wes Daniels has worked for the Charleston Police Department for six-and-a-half years.  During the early evening hours of October 24, 2012, however, he was engaged in a contract capacity for a private organization called FOCUS, an entity associated with the Charleston Housing Authority.  He was accompanied by Corporal Owen Morris, a uniformed patrolman working in the same capacity as Detective Daniels and who has served the Charleston Police Department for approximately five-and-one-half years.

Both Detective Daniels and Corporal Morris are technically FOCUS employees in their moonlighting capacity, but continue to represent the Charleston Police Department.  When necessary, they will display their badges and use their city-issued equipment, including their police cruiser.  They are permitted to do so by the Charleston Police Department pursuant to a memorandum of understanding.  In sum, they are authorized to act as law enforcement officers while on duty with FOCUS, including arrest and citation authority.

At approximately 6:00 p.m. Detective Daniels and Corporal Morris were driving their unmarked cruiser on McCormick Street in Washington Manor, a public housing project.  They

3

reached the intersection of McCormick Street and Joseph Street.
When they halted at the intersection's stop sign, a brown Buick
driven by Mr. Taylor attempted to turn left from Joseph Street
onto McCormick Street.

He was traveling too fast given the narrowness of
McCormick Street in the area where he was attempting the turn.
His vehicle entered the cruiser's side of McCormick Street and,
when it stopped, the officers were essentially looking face-to-
face with Mr. Taylor.  At least half of the Buick would have
impacted the cruiser without an abrupt halt.  Mr. Taylor applied
his brakes to the point that the front of the vehicle bowed down
and the back went upward.  The Buick stopped somewhere between
two feet and a few inches from the cruiser's bumper.

Detective Daniels noticed Mr. Taylor's eyes widened.
He gave the officers a "deer-in-the-headlight[s] look, kind of a
oh-my-gosh kind of surprised kind of look."  (Trans. at 17).
Mr. Taylor reversed course and attempted to back up on Joseph
Street.  Detective Daniels recalled that children regularly
played in the area and that several were on the sidewalk as the
officers earlier drove down McCormick Street.  Fearing Mr.
Taylor's continued reckless driving, he activated the cruiser's
blue signals, a thin light bar located inside the vehicle.

4

At 6:00 p.m., according to the Metro Emergency Operations Center ("Metro Communications") Computer-Aided Dispatch Report ("CAD Report"), the officers called in to report that they were preparing to commence a traffic stop.[1] At that point, Corporal Morris stated that he had an interest in Mr. Taylor before, believing he was "some kind of drug dealer or he suspected he was . . . ." (Id. at 18). Corporal Morris based that suspicion on the fact that he personally witnessed Mr. Taylor on several occasions sitting on his porch "at all hours of the day and night." (Id. at 132). He also noted the unusual level of comings and goings from Mr. Taylor's home.[2]

---

[1]   Richard Lee McElhaney, Agency Coordinator for Metro Communications, testified concerning the CAD Report. He stated that the CAD Report arises from Metro Communications' role in "dispatch[ing] any and all units of emergency responders in Kanawha County." He observed that Metro Communications is charged with "keep[ing] track of . . . just about every move they make as far as if they are inside the car, outside the car, if they stop by the station, any hospital, if they go to a residence, perform a traffic stop, anything like that." (Trans. at 199-200). According to Mr. McElhaney, however, the entries on the CAD Report are only as timely and accurate as the officers who are apprising Metro Communications of their location and activities.

[2]   Specifically, Corporal Morris based his suspicion upon the following conditions that he observed on occasions when he passed by Mr. Taylor's home:

> I worked the East End on my patrol duties as well as in FOCUS where Washington Manor is, and on several occasions, I've drove through and there was a lot of traffic in front of his house, and he would sit on the porch a lot. I would always see him out there.

(cont.)

Detective Daniels approached the vehicle from the driver's side.  Corporal Morris approached from the passenger side, stopping briefly to call the license plate information by radio to Metro Communications, which occurred at 6:02 p.m. according to Corporal Morris and the CAD Report.  Detective Daniels identified himself as a Charleston Police Department detective.  He explained to Mr. Taylor that he was stopped for reckless driving.  Detective Daniels requested Mr. Taylor's driver's license, registration, and proof of insurance.  Mr. Taylor engaged in three suspicious behaviors at this point.

First, he requested to speak with his lawyer. Detective Daniels has accomplished over 1,000 traffic stops during his career.  He has "never had anybody on a traffic stop ask to speak to an attorney . . . [a]nd I explained to him that there was no need to talk to a lawyer at this point."  (Trans. at 19).  In denying the request, Detective Daniels was fearful, in part, of a ruse.  He was concerned that Mr. Taylor could possibly attempt to contact confederates to come to the scene

---

Q.  When you say traffic, do you mean pedestrian traffic or cars?

A. Yes, sir, pedestrian traffic, people always walking back and forth.

(Trans. at 110).

6

and create a dangerous situation.  It is for this reason, as a matter of standard practice, that Detective Daniels does not permit stopped motorists to use their mobile phones, except in narrowly defined DUI cases.

Second, Mr. Taylor avoided eye contact with Detective Daniels, looking down and away.  Third, Detective Daniels noticed that Mr. Taylor was breathing quite rapidly, as if he was exceptionally nervous.  Unlike the generalized observations often made by law enforcement on such matters, Detective Daniels offered a benchmark.  He said the rate of respiration was equivalent to what one would expect if Mr. Taylor had "just ran or something."  (Id. at 19) ("He was just not acting normal for a normal person that you make a traffic stop on. He just seemed really nervous.")).

With Detective Daniels on the driver side of the Buick and Corporal Morris on the passenger side, Mr. Taylor opened his glove box.  Corporal Morris immediately noticed two large stacks of cash therein.[3]  He bent down to attempt to get a better view.

---

[3]    Corporal Morris could not see the denominations.  He also could not estimate the exact size of the stacks.  During his grand jury testimony, he stated that he actually saw a bag of currency in the glove compartment.  The court does not attribute this inconsistency as impacting Corporal Morris's credibility. It is best understood as an innocent failure to recollect.  It is noteworthy that the currency was actually recovered.

(cont.)

Mr. Taylor looked up at Corporal Morris at that point and started to close the glove box to halfway as if to hide from view something contained therein.  He retrieved his proof of insurance and registration and handed it to Detective Daniels.

Corporal Morris immediately started snapping his fingers over the car to attract Detective Daniels' attention. Detective Daniels perceived this signal to suggest that he should have Mr. Taylor exit the vehicle based upon something suspicious that Corporal Morris had seen.

Mr. Taylor refused to step out when asked to do so by Detective Daniels.  He reiterated his desire to speak with an attorney.  He began dialing on his mobile phone while also reaching in and around the interior of the Buick.  Detective Daniels again told Mr. Taylor there was no reason for an attorney to be called and stated that he "need[ed] to get out of the car and listen to" the instructions given him.  (Id. at 20

---

As discussed more fully infra, Rico Moore, a local lawyer, happened upon the scene at a later time.  He asserts that he saw only "a little bit of money" in the glove compartment.  The court does not find this observation credible for at least two reasons.  First, Mr. Moore appears to have been upset about being denied the opportunity to speak with Mr. Taylor on Mr. Moore's terms.  That dissatisfaction was apparent during his testimony.  Second, as more fully discussed infra, Mr. Moore had difficulty accurately recalling the time line.  Based upon the officers' testimony, the court finds that Corporal Morris saw a significant quantity of currency in the glove compartment.

("Nobody is in any trouble right now, I just need you to step out and speak with me so we can figure out what's going on.")). Mr. Taylor was quite agitated and becoming angrier about not being permitted to call his lawyer.  Mr. Taylor again refused to exit the vehicle.

Detective Daniels began to open the vehicle door to assist Mr. Taylor in exiting.  At that point, Mr. Taylor began to comply and ultimately exited the Buick.  Detective Daniels, Corporal Morris, and Mr. Taylor proceeded to the back of the vehicle.  Detective Daniels then asked Mr. Taylor if he had anything that could harm the officers.  Mr. Taylor admitted that he had a pocket or razor knife on him.

Detective Daniels then asked Mr. Taylor to turn and face the vehicle, at which time Detective Daniels prepared to perform a Terry protective frisk.  As Detective Daniels commenced the pat down, however, Mr. Taylor "turned on [him] . . . real fast" and was acting aggressively.  (Id. at 21). Detective Daniels stepped back, informed Mr. Taylor he would not be reaching into his pockets and told him that he just needed to pat Mr. Taylor down for weapons.

Given his lack of cooperation and aggressiveness, Detective Daniels was concerned that Mr. Taylor might have

another undisclosed weapon on his person.  He was handcuffed based upon (1) an officer/detainee safety concern, (2) his earlier rapid movement at the start of the <u>Terry</u> search, (3) his noncompliance with instructions, and (4) his generally confrontational manner.

At that point, Detective Daniels conducted the <u>Terry</u> pat down.  He cannot recall "100 percent" removing the knife, explaining that he felt much safer after Mr. Taylor was handcuffed.  (<u>Id.</u> at 23).  Detective Daniels asked Mr. Taylor about a large bulge in his pocket.  Mr. Taylor said it was $3,000 in cash.  Corporal Morris additionally asked Mr. Taylor about the money in the glove compartment.  Mr. Taylor responded that there was approximately $3,000 therein.  He stressed, however, that law enforcement did not have his consent to search the Buick.  (<u>See id.</u> at 116 (Corporal Morris stating as follows: "Mr. Taylor said that there was approximately 3,000 dollars in there, but we weren't getting in his car, and the conversation ended.")).

Mr. Taylor volunteered that he was coming from his workplace at National Tire and Battery and pointed to his home nearby.  Detective Daniels directed him to sit on the curb slightly to the left of the stop sign at the intersection of McCormick and Joseph Streets.  Detective Daniels then continued

to keep watch over Mr. Taylor and gave Corporal Morris the
driver documents for processing.  From approximately 6:05 to
6:07 p.m., Corporal Morris proceeded to process the driver
documents.  At 6:04 p.m., he called Patrolman Clarence Howell on
his mobile phone.  Patrolman Howell is an officer with the K-9
unit.  He was traveling into Charleston at the time for his
shift commencing at 6:30 p.m.

The scene was quickly becoming a concern.
Approximately 20-30 individuals were watching events transpire.
Some were attempting to approach the scene, walk around the
Buick, and walk around the officers.  Mr. Moore recalled that at
least one member of the crowd stated that he had a right to stay
and watch the events.  Another individual complained that law
enforcement was '"always bothering people'" or words to that
effect.  (Id. at 161).

Corporal Morris' efforts to gather information about
Mr. Taylor are an important part of the Fourth Amendment time
line.  First, as noted, he contacted Metro Communications by
radio between approximately 6:05 p.m. and 6:07 p.m. to run the
driver's license and registration.[4]  They came back clear.

---

[4] The CAD Report shows in its "Narrative" section that Mr.
Taylor's driver's license number and registration were run by
Metro Communications at 8:02 p.m.  This apparent discrepancy was
(cont.)

Second, during two separate mobile phone calls to the Charleston
Police Records Division ("Records Division") at 6:07 p.m. (for
three minutes) and 6:09 p.m. (for one minute), he had a warrant
check run, taking the clock to 6:10 p.m.[5] He learned no warrants
were pending, but Mr. Taylor had a previous arrest for
possessing a controlled substance with intent to distribute.[6]

---

explained by Mr. McElheny as arising from either one of three
possible scenarios.  First, Corporal Morris may not have
requested that the driver's license and registration be run at
the time of the stop.  Second, the information in the
"Narrative" section, while sometimes electronically pasted into
the CAD Report, is actually produced by a different software
application.  Mr. McElheny observed that the two applications
involved may be running on a different clock.  Third, one
dispatcher might run the information for the officer, take a
break from his terminal, and then be run again at a later time
by another dispatcher and pasted into the "Narrative" section at
that later time.  This would occur inasmuch as the replacement
dispatcher would not have access to the earlier-run report on
the first dispatcher's terminal.

Based upon the fact that two different dispatchers worked
on the applicable CAD Report, the third scenario is the most
plausible.  Accordingly, the times listed in the "Narrative"
section are not treated as a real-time diary entry.  From a
practical standpoint, the officers would either have run the
driver's license and registration at the time of the stop or not
at all, but certainly not two hours following the stop.

[5] The court notes that the two calls to the Records Division
temporally overlap with one another.  Neither party has
explained the discrepancy nor objected to the accuracy of the
mobile phone billing records.

[6] Mr. Taylor faults Corporal Morris with unnecessarily phoning
the Records Division.  He asserts that a warrant check would
have been performed during the earlier call to Metro
Communications according to the testimony received from Richard
McElhaney.  The Records Division would be the authoritative

(cont.)

Patrolman Howell arrived  less than two minutes later, at 6:12
p.m.

The Records Division disclosure prompted Corporal
Morris to use his mobile phone again.  He placed calls to three
detectives with the Metro Drug Enforcement Unit ("MDENT") to
learn if they possessed any information concerning Mr. Taylor.[7]
At 6:10 p.m. (for one minute), he called Lieutenant Matt Petty.
At 6:11 p.m. (for two minutes), he called Detective Rob Welsh.
At 6:12 p.m. (for two minutes), he phoned Lieutenant Chad
Napier, a detective.  At 6:14 p.m. (for two minutes), he phoned
Detective Petty again.  The record does not disclose if he spoke
with Detectives Petty or Welsh or received their voicemail.

The record does reflect the conversation with Lt.
Napier, who advised of his uncertain belief that Mr. Taylor may
be "on federal paper," which is apparently a shorthand reference
to being under federal court supervision  (Id. at 136-37).
Corporal Morris was speaking with Lt. Napier on the third call
when Patrolman Howell and Jux arrived at 6:12 p.m.

---

source for local warrant information.  Inasmuch as this call did
not materially extend the time line, it is of little moment.
[7] Corporal Morris noted that it was not his usual practice to
phone the Metro Drug Unit.  He did so in this instance, however,
based on "the totality of what we had at that point, there's . .
. believed to be a large sum of money in the glove box. He also
had a . . . prior charge of possession with intent."  (Trans. at
128).

Patrolman Howell has worked with the K-9 unit for two years and four months.  He received extensive training with Jux.  There is no dispute respecting his, or Jux's, competence and experience to perform canine sniffs for narcotics, apprehension, and tracking.   Prior to Patrolman Howell arriving on the scene, Detective Daniels "permeated" the Buick.  (Id. at 65).  The process involves a physical entry into the vehicle by law enforcement, rolling up its windows, turning off the ignition but leaving the key in the "on" position, and then turning on the vehicle's interior fan to blow any aromas in the vehicle out to the exterior.  This appears to be a standard practice for the Charleston Police Department when the K-9 unit is called.  (See Trans. at 66 (Detective Daniels stating "And as far as my experience, every other K-9 officer that I've dealt with, they have you permeate the car is what they call it like I described to you before their arrival."); (id. at 86 (Patrolman Howell noting that his K-9 supervisor trained him that "when you conduct a traffic stop, we permeate the vehicle.")).

Patrolman Howell reiterated that one must enter the detained vehicle in order to permeate it.  There are no state or national standards respecting permeation and Patrolman Howell has never read nor received any literature concerning the process.  Interestingly, Patrolman Howell suggested that

permeation was unnecessary for an effective K-9 sniff.  He
testified as follows: "On some of our training we do
unpermeated, some we do permeated, and he detects unpermeated
and permeated."  (Id. at 88; see also id. at 91).[8]  When asked
why permeation is performed if it is unnecessary for finding
contraband, Patrolman Howell responded "That's what I do. If
it's available, we permeate the vehicle. If he has a key and
they state they have a key, we permeate the vehicle." (Id. at
91).

Simultaneously with Patrolman Howell's arrival on the
scene, a local lawyer acquainted with Mr. Taylor, Rico Moore,
also appeared at about 6:12 p.m.  Mr. Taylor had in the past on
unstated occasions phoned Mr. Moore for legal advice.  Mr.
Moore, however, was not in the area to speak with Mr. Taylor.
He was coincidentally in the vicinity to pick up his nephew on
McCormick Street.  Mr. Moore immediately saw Mr. Taylor
handcuffed and apparently attempting to draw his attention.  Mr.
Moore then exited his car and began walking toward Mr. Taylor.

---

[8] Patrolman Howell dispelled any doubt on the point later in his
testimony as follows:

> Q. Does this permeation, it increases the chances that
> K-9 Officer Jux will provide a positive alert?
>
> A. It don't increase the chances.

(Id. at 94).

At about the same time, Patrolman Howell was approaching Mr. Taylor to ask if he owned the Buick and if anything therein might cause Jux to alert, such as narcotics. He also gathered some identifying information from the Buick's exterior.  At this point, Mr. Moore approached the officers and announced that he wished to speak with Mr. Taylor.  Detective Daniels responded that "this wasn't the time or the place to speak with his client, he was not under arrest at this point, and we were trying to conduct an investigation and we weren't going to be able to do that safely with him interfering with us."  (Id. at 27).

Corporal Morris informed Mr. Moore that Mr. Taylor had desired to contact him.  Mr. Moore was further advised that he could not do so unless and until Mr. Taylor was arrested. Detective Daniels added that if Mr. Taylor was arrested, law enforcement would "absolutely" allow him to meet with Mr. Moore. (Id. at 27 (Detective Daniels also stating his suggestion to Mr. Moore that "right now I can't conduct my investigation safely with you coming over here and raising a ruckus basically and more people, drawing a crowd and people coming outside.")).

Mr. Moore continued to discuss the matter with the officers, continuing his demands to speak with Mr. Taylor.  Mr. Moore then left the scene in order to park his vehicle at a

nearby church.  When he returned, he was on the corner across
Joseph Street from where Mr. Taylor was seated.  He was closest
to the passenger side of the Buick.  Contrary to law
enforcement's instructions, Mr. Moore once again attempted to
reach Mr. Taylor, walking across the street to speak with him.[9]

Detective Daniels testified that Mr. Moore was "being
very loud and causing a scene" and drawing a crowd.  (Id. at
45).  He desisted only when Detective Daniels cautioned him that
his failure to comply would result in his arrest.

Detective Daniels expressed that his instructions to
Mr. Moore arose out of safety concerns.  For example, the
officers' attention was drawn in multiple directions while
attempting to conclude the traffic stop, watching Mr. Taylor,
monitoring Mr. Moore, and assuring no secondary disturbance or

---

[9]     When Mr. Moore arrived on the scene at about 6:12 p.m., Mr.
Taylor was handcuffed.  He claims to have spoken then with the
officers for approximately five to seven minutes.  After
completing his conversation with the officers, the clock would
have stood at 6:17 to 6:19 p.m.  Allowing a meager two minutes
for the time necessary to park his vehicle at the church and
return to the scene, he asserts that he then conversed across
the street with Mr. Taylor for approximately ten to fifteen
minutes before the canine unit arrived.  According to Mr. Moore,
then, the canine unit did not arrive until approximately 6:29 to
6:36 p.m.
        The testimony and documentary evidence plainly reflect that
Patrolman Howell arrived at 6:12 p.m.  The court is thus unable
to credit Mr. Moore's time line due to his inability to
accurately recall the material intervals.

threatening situation arose from the growing throng of
onlookers.  Detective Daniels noted that once Mr. Moore took his
place on the curb opposite Mr. Taylor, the two were conversing
and law enforcement "had no problem with them speaking back and
forth at that point."  (Id. at 48).

Patrolman Howell and Jux then commenced the sniff
between approximately 6:14 and 6:15 p.m.  During that time,
Corporal Morris, Detective Daniels, and Mr. Taylor spoke to one
another.  Corporal Morris asked Mr. Taylor
about any prior felony convictions.  Mr. Taylor reported that he
was "on federal paper."  (Id. at 119).

Detective Daniels characterized the sniff as the
"moment of truth."  (Id. at 59).  If an alert occurred, the
investigation would continue.  If Jux failed to alert, the
officers would have returned Mr. Taylor's driver documents,
issued a warning citation for reckless driving, failure to
maintain his lane, or driving too fast for conditions and sent
Mr. Taylor on his way.  Patrolman Howell testified about the
results of the sniff:

> We walked around -- he worked around the trunk of the
> vehicle, and we're on the passenger side or passenger
> side back fender of the vehicle, and at that time Jux
> started pulling me towards the passenger side front
> door, the middle seam in the door, at which time I
> heard his -- his sniffing intensify, rapid -- rapids
> shorts of breath, and at this time he alerted by

> sitting by the driver's door and placing his nose on
> the seam of the door. And, again, I asked him where is
> that, he again places his nose on the seam of the
> door.

(Id. at 78).[10]

After placing Jux in his vehicle, Patrolman Howell
informed Detective Daniels and Corporal Morris of the alert.
Patrolman Howell then stayed with Mr. Taylor as Detective
Daniels and Corporal Morris approached the vehicle to search it.

Corporal Morris opened the glove compartment and
retrieved the currency.  Detective Daniels searched underneath
the driver's seat and saw a handgun.  He alerted Corporal
Morris.  While later preparing to place the firearm in an
evidence bag, Detective Daniels noticed that there were at least
15 rounds inside the magazine.  After securing the firearm,
Detective Daniels asked Mr. Taylor if he "was on probation or
parole or anything."  (Id. at 33).  Mr. Taylor stated that he
was on federal probation for a prior drug charge, in actuality a
term of supervised release.  The officers informed Mr. Taylor
that he was under arrest for being a felon in possession of a
firearm.  Corporal Morris searched Mr. Taylor's person following

---

[10]    Mr. Moore witnessed the sniff.  He admitted, however, that
he could not tell whether Jux alerted inasmuch as he had "no
idea" what the tell would look like.  (Id. at 159).

his arrest, finding two large wads of currency in each front

pocket.[11]  He was placed in a nearby cruiser.

Corporal Morris continued the search, moving to the

Buick's trunk.  There he found a duffel bag.  He unzipped it and

saw a large grocery-type bag full and tied at the top.  He

looked closer and saw additional stacks of currency.  The total

amount of currency recovered was $93,157.

Senior Patrolman Derrick McDaniel, a twelve-year

veteran of the Charleston Police Department, arrived on the

scene after speaking by mobile phone with Corporal Morris at

6:03 p.m.  Patrolman McDaniel was informed that a large sum of

currency had been observed during a traffic stop, and Corporal

Morris wished to know if Patrolman McDaniel had any prior

dealings with Mr. Taylor.  When Patrolman McDaniel arrived on

the scene, Mr. Taylor said something to him as he walked to

where the other officers were near the Buick.

Patrolman McDaniel approached Mr. Taylor, whom he

recognized as an acquaintance with whom he grew up in the same

---

[11]    Corporal Morris testified at the evidentiary hearing that
Mr. Taylor was searched prior to law enforcement discovering the
weapon.  He apparently testified before the grand jury that Mr.
Taylor was instead searched after a weapon was found in the
vehicle.  The court credits the earlier grand jury account
inasmuch as it was given approximately three weeks following Mr.
Taylor's arrest.

neighborhood.  Mr. Taylor told  Patrolman McDaniel that the officers stopped him for no reason and that he had a firearm in the vehicle for protection due to a shooting across the street from his home.  The conversation terminated when  Patrolman McDaniel reminded Mr. Taylor that he had not provided him Miranda warnings.  Mr. Taylor admitted that he had $90,000 in currency upon inquiry from  Patrolman McDaniel.  The United States does not intend to use that statement at trial.

On November 15, 2013, the United States filed a single-count indictment charging Mr. Taylor with possessing the recovered firearm after having previously been convicted in 2005 of possessing with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1).  On December 13, 2012, Mr. Taylor moved to suppress all fruits of the October 24, 2012, traffic stop.  First, he asserts that the officers lacked probable cause to stop Mr. Taylor.  Second, he contends that law enforcement exceeded the customary scope of a traffic stop and instead pursued a criminal investigation that measurably prolonged the stop without reasonable suspicion.

On December 27, 2012, Mr. Taylor filed a supplemental motion to suppress.  Relying upon United States v. Jones, 132 S. Ct. 945 (2012), Mr. Taylor asserts that the permeation of his vehicle resulted in an impermissible trespass in violation of

the Fourth Amendment.  On January 14, 2013, Mr. Taylor filed a
second supplemental motion to suppress.  He asserts that Jux did
not alert during the sniff contrary to Patrolman Howell's
testimony.

On February 4, 2013, the court, at Mr. Taylor's
request, permitted the filing under seal of certain mobile phone
records obtained from Corporal Morris and Patrolman Howell.  On
February 6, 2013, Mr. Taylor responded to the court's invitation
to point out those portions of the mobile phone records relevant
to the suppression motions.  In addition to his receipt of the
incoming call from  Patrolman McDaniel at 6:03 p.m. spanning one
minute, Corporal Morris' material mobile phone calls discussed
supra are summarized below:

| Time Placed | Phone Call To | Duration |
|---|---|---|
| 6:04 p.m. | Patrolman Howell | 2 Minutes |
| 6:07 p.m. | Records Division (warrant check) | 3 Minutes |
| 6:09 p.m. | Records Division (warrant check) | 1 Minute |
| 6:10 p.m. | Det. Matt Petty (MDENT) | 1 Minute |
| 6:11 p.m. | Det. Rob Welsh  (MDENT) | 2 Minutes |
| 6:12 p.m. | Det. Chad Napier (MDENT) | 2 Minutes |
| 6:14 p.m. | Det. Matt Petty  (MDENT) | 2 Minutes |

The parties have briefed the additional issues raised
by the mobile phone records.  The substance appearing therein
requires further findings by the court.  First, Mr. Taylor uses
the CAD Report to assert that Corporal Morris contacted Metro

Communications at 6:00 p.m. and 6:02 p.m.  He asserts that the
first contact occurred when Corporal Morris called out the
license tag to Metro Communications and the second when he was
advised by them that Mr. Taylor's driver's license and
registration were clear.

It is instead the case, consistent with the court's
earlier findings, that the 6:00 p.m. contact alerted Metro
Communications that a traffic stop was being commenced.  The
second contact at 6:02 p.m. reflected Corporal Morris calling
out the license tag.  Corporal Morris could not have received
word that the driver's license and registration were clear at
that point.  He was not yet in possession of the driver
documents.  As earlier found, Corporal Morris proceeded to
process the driver documents between approximately 6:05 and 6:07
p.m.

Next, Mr. Taylor asserts that at 6:14 p.m., there is a
hiatus in the "flurry of mobile phone activity," (Def.'s Br. at
3), by Corporal Morris.  He notes that the calls to and from
Corporal Morris' mobile phone then commence anew with a call to
Detective Napier at 6:30 p.m.  He posits that Patrolman Howell,
who spoke with Corporal Morris prior to the sniff, would likely
have done so shortly after 6:15 p.m.  He stresses that this time
line means five minutes elapsed between the call to the Records

23

Division and commencement of the sniff.  For the reasons earlier
expressed, the court does not adopt this reading.  The court
treats the sniff as commencing between approximately 6:14 to
6:15 p.m. based upon the hiatus in the phone traffic at that
point.[12]


II.


      Mr. Taylor's challenge to the stop and search of the
Buick can be divided into four separate parts.  First, the court
must ascertain if law enforcement possessed reasonable suspicion
or probable cause to stop the Buick.  Second, the duration of
the stop must be assessed in order to determine if it exceeded
the time reasonably necessary to address any moving violation.
Third, if the duration exceeded the constitutional maximum, the
question arises as to whether any extension of the stop was
justified based upon additional reasonable suspicion that
developed during Mr. Taylor's detention.  Fourth, the court must
pass on whether the decisions in <u>Jones</u> and <u>Jardines</u> nevertheless
doom the lawfulness of the search based upon law enforcement's
pre-search entry into, and permeation of, Mr. Taylor's vehicle.

---

[12] Mr. Taylor attributes a nefarious motive to Corporal Morris
contacting Patrolman Howell by mobile phone.  The undeveloped
claim is speculative and requires no discussion.

A.      Reasonable Suspicion for the Stop


        The Fourth Amendment protects the citizenry "against
unreasonable searches and seizures." U.S. CONST. amend. IV.  Our
court of appeals observed as follows in United States v. Branch,
537 F.3d 328 (4th Cir. 2008): "It is well established that the
'[t]emporary detention of individuals during the stop of an
automobile by the police . . . constitutes a "seizure,"' no
matter how brief the detention or how limited its purpose."  Id.
at 335 (quoting Whren v. United States, 517 U.S. 806, 809
(1996)).  The decision in Branch additionally notes, however,
that an officer who observes a traffic violation is vested with
"sufficient justification . . . to detain the offending vehicle
for as long as it takes to perform the traditional incidents of
a routine traffic stop."  Id. at 335.

        The court has found that Mr. Taylor was traveling at a
reckless speed for purposes of negotiating the turn from Joseph
Street onto McCormick Street.  This reckless action resulted in
a near collision with the cruiser, not to mention endangering
children or other pedestrians in the area.  The officers were
thus fully justified in detaining Mr. Taylor, checking his
driver information, and issuing a warning or a citation for
operating the Buick in "willful or wanton disregard for the

safety of persons or property" for which one is guilty of
reckless driving.  W. Va. Code § 17C-5-3.

        Detective Daniels' request for identification and
registration was likewise appropriate.  It is now settled that
when a lawful traffic stop is made, "an officer . . . to gain
his bearings and . . . acquire a fair understanding of the
surrounding scene . . . may request identification of . . .
[vehicular] passengers . . . ."  United States v. Soriano-
Jarquin, 492 F.3d 495, 500 (4th Cir. 2007); see also Branch, 537
F.3d at 337 ("If a police officer observes a traffic violation,
he is justified in stopping the vehicle for long enough to issue
the driver a citation and determine that the driver is entitled
to operate his vehicle."); United States v. Foreman, 369 F.3d
776, 781 (4th Cir. 2004) ("[D]uring a routine traffic stop, an
officer may request a driver's license and vehicle registration,
run a computer check, and issue a citation.").

        It was also entirely within the officers' discretion
to request that Mr. Taylor exit the Buick.  United States v.
Vaughan, 700 F.3d 705, 710 (4th Cir. 2012) ("Additionally, 'a
police officer may as a matter of course order the driver of a
lawfully stopped car to exit his vehicle.'") (quoting Maryland
v. Wilson, 519 U.S. 408, 410 (1997).

                              26

B.    The Length of Stop and Additional Grounds for Reasonable
      Suspicion

        Our court of appeals' recent decision in <u>United States</u>

<u>v. Mubdi</u>, 691 F.3d 334 (2012), encapsulates the applicable law:

> Traffic stops must be limited in both scope and
> duration.  With respect to scope, "the investigative
> methods employed should be the least intrusive means
> reasonably available to verify or dispel the officer's
> suspicion in a short period of time."  As for
> duration, the police must "diligently pursue[] a means
> of investigation that [is] likely to confirm or dispel
> their suspicions quickly." . . . .
>
>         In the context of traffic stops, police diligence
> encompasses requesting a driver's license and vehicle
> registration, running a computer check, and issuing a
> ticket.  If a police officer seeks to prolong a
> traffic stop to allow for investigation into a matter
> outside the scope of the initial stop, he must possess
> reasonable suspicion or receive the driver's consent.
> Additionally, "if the driver obstructs the police
> officer's efforts in any way -- for example, by
> providing inaccurate information -- a longer traffic
> stop would not be unreasonable."

<u>Id.</u> at 343 (citations and parenthetical material omitted); <u>see</u>

<u>also</u> <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2509 (2012) ("We

have held that a detention based on reasonable suspicion that

the detainee committed a particular crime 'can become unlawful

if it is prolonged beyond the time reasonably required to

complete that mission.'") (quoting <u>Illinois v. Caballes</u>, 543

U.S. 405, 407 (2005) ("A seizure that is justified solely by the

interest in issuing a warning ticket to the driver can become

unlawful if it is prolonged beyond the time reasonably required to complete that mission").

The traffic stop commenced at 6:00 p.m. The officers arrived at the Buick's door at 6:02 p.m. They did not find a compliant driver nor one plaintively seeking a reprieve. Mr. Taylor was uncooperative and hostile from the outset. The officers finally secured his driver documents and his exit from the vehicle, patted him down, and positioned him at the curb at approximately 6:04 p.m., when Corporal Morris promptly began processing the driver documents.

Corporal Morris diligently concluded his investigation of the driver documents at approximately 6:07 p.m. He cannot be faulted for then undertaking a rapid manual search for warrants with the Records Division until 6:10 p.m. The investigative methods used were minimally intrusive and reasonably available to Corporal Morris. When one considers that he would then have been required to write up a warning or citation thereafter, and briefly discuss it with Mr. Taylor, the duration component is likewise unremarkable. One must take into consideration as well (1) Mr. Moore's appearance on the scene and his uncooperativeness, and (2) a growing crowd from which at least a couple of hostile utterances were heard. This distraction would reasonably be expected to consume about two minutes that, if run

from the time of Patrolman Howell's arrival at 6:12 p.m., would put the clock in the range of when Jux alerted.  This results in a rather tight time line indicative of diligence.

The court is thus unable to conclude that the officers offended the Fourth Amendment scope and duration requirements. In sum, the stop was not prolonged beyond the time reasonably required to complete its mission under the circumstances faced by the officers.

Moreover, any perceived prolongation was supported by reasonable suspicion of other criminal activity outside the scope of a reckless driving charge.  That suspicion  began to rapidly materialize and mount even prior to the officers leaving their cruiser.  Corporal Morris immediately identified Mr. Taylor as an individual about whom he previously harbored drug distribution concerns.  Then, Mr. Taylor sought to speak with his lawyer from the outset, an unusual request previously not encountered by Detective Daniels over the course of 1,000 traffic stops.

Mr. Taylor avoided eye contact with Detective Daniels. His nervous manner was well beyond what one would expect from an otherwise law-abiding motorist who committed a moving violation. His breathing was also labored and similar to what one would

expect from someone who had just been running.  It is well-settled that evasive behavior and alarmed reaction lend support to development of reasonable suspicion.  <u>See</u>, <u>e.g.</u>, <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000) (stating "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.") (citing cases); <u>United States v. Vaughan</u>, 700 F.3d 705, 711 (4th Cir. 2012) (noting "nervous behavior, which was at least as pronounced as the behavior described in" prior Fourth Circuit precedent "was a valid factor contributing to reasonable suspicion"); <u>United States v. Smith</u>, 396 F.3d 579, 584 (4th Cir. 2005); <u>United States v. Humphries</u>, 372 F.3d 653, 657 (4th Cir. 2004); <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993).

Next, Corporal Morris noticed a significant quantity of currency in the glove box, which Mr. Taylor immediately attempted to shield from view.  Mr. Taylor next refused Detective Daniels' request that he exit the Buick, again demanding to speak with a lawyer.  Mr. Taylor was both agitated and angry by this point.

After learning that Mr. Taylor had a knife, Detective Daniels quite reasonably advised him that a pat down was necessary.  When it commenced, however, Mr. Taylor turned quickly to confront Detective Daniels.  Moments later, Mr.

Taylor admitted to having a total of $6,000 on his person and in the glove box.  This amount of currency alone is significant for Terry purposes.  See, e.g., United States v. Chhien, 266 F.3d 1, 8-9 (1st Cir. 2001) (concluding that discovery of $2,000 in cash during traffic stop supported determination of reasonable suspicion and justified a brief period of further detention); Conrod v. Davis, 120 F.3d 92, 97 (8th Cir. 1997) (concluding that discovery of $6,000 cash in individual's pocket and $4,000 in suitcase furnished reasonable suspicion).

The totality of the circumstances thus supported the additional reasonable suspicion necessary to summon Patrolman Howell at 6:04 p.m. and allow him to perform the K-9 sniff commencing between approximately 6:14 to 6:15 p.m. and, further, to inquire of the three MDENT detectives.  Once apprised of Mr. Taylor's arrest on the controlled substance offense and his federal supervisee status at 6:12 p.m., the legality of the stop, even if deemed excessive in scope and duration from the initial justification, was necessary to allay the officers' well-founded suspicions of criminal activity.

31

C.   **The Permeation Process and the Decisions in <u>Jones</u> and
     <u>Jardines</u>**

In <u>Jones</u>, law enforcement installed a Global-
Positioning-System ("GPS") tracking device on the undercarriage
of the defendant's Jeep while it was stationed in a public
parking lot.  The device was then used over the next 28 days to
track the vehicle.  The fruits of that tracking effort produced
a grand jury indictment resulting in the defendant's ultimate
conviction.

The Supreme Court concluded that the "installation of
a GPS device on a target's vehicle, and . . . [the] use of that
device to monitor the vehicle's movements, constitutes a
'search'" within the meaning of the Fourth Amendment.  <u>Id.</u> at
949.  The customary inquiry for decades in determining whether a
Fourth Amendment "search" had occurred focused, at that time, on
whether the accused enjoyed a "reasonable expectation of
privacy" in the invaded area.

In <u>Jones</u>, however, the Supreme Court revived the
property-based inquiry that long dominated Fourth Amendment
jurisprudence in the decades preceding the "reasonable
expectation of privacy" test:

> It is important to be clear about what occurred in
> this case: The Government physically occupied private
> property for the purpose of obtaining information. We
> have no doubt that such a physical intrusion would
> have been considered a "search" within the meaning of
> the Fourth Amendment when it was adopted.

Jones, 132 S. Ct. at 949.  In arriving at its conclusion, the

majority opinion referenced the decision rendered decades

earlier in New York v. Class, 475 U.S. 106 (1986).  In Class,

the Supreme Court "concluded that an officer's momentary

reaching into the interior of a vehicle did constitute a

search."  Jones, 132 S. Ct. at 952 (describing the holding in

Class).[13]

---

[13] Class addressed whether "a police officer may reach into the
passenger compartment of a vehicle to move papers obscuring the
VIN after its driver has been stopped for a traffic violation
and has exited the car." Class, 475 U.S. at 108.  In finding
the search reasonable, the majority opinion observed as follows:

> We hold that this search was sufficiently unintrusive
> to be constitutionally permissible in light of the
> lack of a reasonable expectation of privacy in the VIN
> and the fact that the officers observed respondent
> commit two traffic violations. Any other conclusion
> would expose police officers to potentially grave
> risks without significantly reducing the intrusiveness
> of the ultimate conduct -- viewing the VIN -- which,
> as we have said, the officers were entitled to do as
> part of an undoubtedly justified traffic stop.

Id. at 119. The Supreme Court stressed that the law requires a
VIN be viewable from the vehicle exterior and that the officer
could have lawfully required the driver to remove the papers
obstructing its appearance. It also included language sharply
confining its holding so as to avoid other unlicensed entries by
law enforcement: "We note that our holding today does not
authorize police officers to enter a vehicle to obtain a
                                                    (cont.)

The trespass that occurred in <u>Jones</u>, and its information-gathering goal, transgressed the right "to be secure against unreasonable searches and seizures in . . . persons, houses, papers and effects." <u>Id.</u>  That same rule is already being observed across the circuits, including our own.  <u>See</u>, <u>e.g.</u>, <u>Free Speech Coalition, Inc. v. Attorney General</u>, 677 F.3d 519, 543 (3rd Cir. 2012) (stating "[A] Fourth Amendment search also occurs where the government unlawfully, physically occupies private property for the purpose of obtaining information."); <u>United States v. Cowan</u>, 674 F.3d 947, 956 (8th Cir. 2012)("We also must consider whether the government conducted a search by physically intruding on 'a constitutionally protected area' to find something or obtain information.")(citing <u>Jones</u>, 132 S. Ct. at 951); <u>United States v. Davis</u>, 690 F.3d 226, 242 n.23 (4th Cir. 2012); <u>United States v. Perea-Rey</u>, 680 F.3d 1179, 1184 (9th Cir. 2012).[14]

---

dashboard-mounted VIN when the VIN is visible from outside the automobile."  <u>Id.</u> at 119.

[14]   It is noted that the Supreme Court in <u>Jones</u> did not reach the United States' additional argument that "even if the attachment and use of the device was a search, <u>it was reasonable</u> -- and thus lawful -- under the Fourth Amendment because 'officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy.'" <u>Id.</u> at 953.  The United States here asserts that in the event Detective Daniels' entry into the
(cont.)

And just this Term, the Supreme Court had occasion to elaborate further upon the rule applied in <u>Jones</u>.  In <u>Florida v. Jardines</u>, 133 S. Ct. 1409 (2013), law enforcement took a trained K-9 to Jardines' front porch.  The K-9 alerted for narcotics.  A warrant was obtained based upon the alert.  The ensuing search revealed marijuana plants.  The question in <u>Jardines</u> was whether the use of the K-9 on the homeowner's porch to investigate the contents of the home constituted a "search" within the meaning of the Fourth Amendment.

After reiterating the rule announced last Term in <u>Jones</u>, the Supreme Court observed as follows:

> Th[e] principle [from <u>Jones</u>] renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

<u>Id.</u> at 1414.

Mr. Taylor explicitly prohibited law enforcement from entering the Buick.  Detective Daniels ignored that prohibition and entered the Buick prior to Patrolman Howell's arrival.  If

Buick for permeation constituted a search at all, it was nevertheless a reasonable search.

performed in accordance with the permeation practices of the
Charleston Police Department, he additionally rolled up the
vehicle's windows, turned the key to the "on" position, and then
energized the interior fan.  The purpose was to blow any aromas
in the vehicle out toward the exterior, where Jux would soon be
sniffing.[15]

---

[15]  Unlike the nonconsensual vehicle entry in this case, which
was followed by law enforcement manipulating the Buick's
controls, our court of appeals recently made brief reference to
a canine sniff that occurred following a law enforcement request
that the defendant "roll up the windows, turn off the engine,
and step out of the car."  United States v. Mubdi, 691 F.3d 334,
338 (4th Cir. 2012).  The request was not in issue in the case
and received no scrutiny.  At least one other circuit has
addressed a similar situation where law enforcement requested
that the driver prepare his vehicle for the canine search.  See,
e.g., United States v. Ladeaux, 454 F.3d 1107, 1110 (10th Cir.
2006) ("We . . . remand for the district court to consider in
the first instance whether the evidence obtained during the stop
ought to be suppressed based on the request to close the windows
and open the vents.").  The more frequently arising cases are
those where law enforcement will "prep" or "poof" a closed but
permeable container in order to force the aromas out for
olfactory examination.  United States v. Garcia, 849 F.2d 917
(5th Cir. 1988) (holding that moving and squeezing checked
luggage did not violate the Fourth Amendment); United States v.
Viera, 644 F.2d 509 (5th Cir. 1981) (holding that squeezing
checked luggage to produce a scent did not violate the Fourth
Amendment).  That type of practice has received closer scrutiny
following the Supreme Court's decision in Bond v. United States,
529 U.S. 334 (2000).  See id. at 338-39 (observing that "a bus
passenger clearly expects that his bag may be handled. He does
not expect that other passengers or bus employees will, as a
matter of course, feel the bag in an exploratory manner. But
this is exactly what the agent did here. We therefore hold that
the agent's physical manipulation of petitioner's bag violated
the Fourth Amendment")

Despite Patrolman Howell's apparent reluctance to recognize the utility of this practice, it seems evident that it is designed to improve the chances that the K-9 will sense the presence of controlled substances and, using that information, alert on the vehicle and establish probable cause.  As in <u>Jones</u> and <u>Jardines</u>, law enforcement physically occupied private property -- the Buick -- for the purpose of obtaining information -- the otherwise undetectable, or less easily detected, odors of controlled substances -- found therein. Probable cause was lacking for that unreasonable search.  The search thus transgressed the Fourth Amendment.

In that regard, it is worth restating the context of the stop and ensuing search.  The sole source of probable cause to search the Buick was Jux's alert.  Without it, Mr. Taylor, by law enforcement's admission, would have been written a warning and sent on his way.  With it, the vehicle was searched and the illegal weapon was recovered.  It is thus of some moment that the alert, which ultimately yielded no controlled substances, may have occurred only due to the permeation process reintroducing into circulation in the vehicle some controlled substance that was present therein at a prior time.  That fact, in addition to law enforcement entering private property without probable cause -- and against the property owner's explicit

37

instructions -- plainly illustrates the unreasonable nature of the search.

Having found the entry into Mr. Taylor's car to constitute an unreasonable search, the question of a remedy remains. United States v. Davis, 690 F.3d 226, 251 (4th Cir. 2012)("Having determined that there was a Fourth Amendment violation in the extraction and testing of Davis' DNA profile, and having assumed, but not decided, there was a second violation in the retention of his profile, we address whether suppression is the proper remedy. Leon, 468 U.S. at 906, 104 S. Ct. 3405 ('Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.') (citation and internal quotation marks omitted).").

The parties have not briefed whether this is an instance in which the exclusionary rule should be applied.  It is, accordingly, ORDERED as follows:

1.   That the United States be, and hereby is, given leave to file a brief no later than May 28, 2013, respecting application of the exclusionary rule;

38

2.    That Mr. Taylor be, and hereby is, given leave to respond until June 11, 2013; and

3.    That the United States be, and hereby is, given leave to reply on or before June 18, 2013.

The Clerk is directed to transmit a copy of this written opinion and order to the defendant and counsel of record.

ENTER:  May 14, 2013

John T. Copenhaver, Jr.
United States District Judge