UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

UNITED STATES OF AMERICA

v.                          CRIMINAL ACTION NO. 2:12-00216

MARCUS WYN TAYLOR

MEMORANDUM OPINION AND ORDER

Pending are defendant Marcus Wyn Taylor's motion to suppress evidence, filed December 13, 2012, supplemental motion to suppress evidence, filed December 27, 2012, and second supplemental motion to suppress evidence, filed January 14, 2013.

I.

The discussion that follows assumes a familiarity with the findings of fact and conclusions of law set forth in the May 14, 2013, memorandum opinion and order.  In summary, on October 24, 2012, Detective Wes Daniels and Corporal Owen Morris performed a traffic stop on defendant Marcus Taylor after he nearly struck their cruiser while attempting a turn.

Corporal Morris had previously witnessed Mr. Taylor on several occasions sitting on his porch "at all hours of the day and night." (Hearing Trans. at 132). He also noted the unusual level of comings and goings from Mr. Taylor's home.[1] These factors caused Corporal Morris to suspect that Mr. Taylor was involved in the drug trade. Both officers approached the vehicle. After Detective Daniels requested Mr. Taylor's driver's license, registration, and proof of insurance, Mr. Taylor immediately requested to speak with his lawyer. He avoided eye contact with Detective Daniels and he was breathing rapidly, as if he had "just ran or something." (Id. at 19) ("He was just not acting normal for a normal person that you make a traffic stop on. He just seemed really nervous.")).

---

[1]   Specifically, Corporal Morris based his suspicion upon the following conditions that he observed on occasions when he passed by Mr. Taylor's home:

I worked the East End on my patrol duties as well as in FOCUS where Washington Manor is, and on several occasions, I've drove through and there was a lot of traffic in front of his house, and he would sit on the porch a lot. I would always see him out there.

Q. When you say traffic, do you mean pedestrian traffic or cars?

A. Yes, sir, pedestrian traffic, people always walking back and forth.

(Trans. at 110).

2

When Mr. Taylor opened his glove box, Corporal Morris, who was stationed at the passenger side window of the vehicle, noticed two large stacks of cash therein.  When he attempted a closer look, Mr. Taylor looked up at Corporal Morris and started to close the glove box to halfway as if to hide from view something contained therein.  He retrieved his proof of insurance and registration and handed it to Detective Daniels.

Corporal Morris alerted Detective Daniels, who then asked Mr. Taylor to step out of the vehicle.  After refusing to comply, Mr. Taylor again asked to speak with his lawyer.  Mr. Taylor was quite agitated and becoming angrier about not being permitted to call his lawyer.  Mr. Taylor again refused to exit the vehicle.  He ultimately did so only after Detective Daniels began to open the vehicle door to assist Mr. Taylor in exiting.

After Mr. Taylor admitted that he had a knife on his person, Detective Daniels asked him to turn and face the vehicle for a protective frisk.  As Detective Daniels commenced the pat down, however, Mr. Taylor "turned on [him] . . . real fast" and was acting aggressively.  (Id. at 21).  Detective Daniels stepped back, informed Mr. Taylor he would not be reaching into his pockets and told him that he just needed to pat Mr. Taylor down for weapons.  He then handcuffed him.

3

Corporal Morris asked Mr. Taylor about the money in the glove compartment.  Mr. Taylor responded that there was approximately $3,000 therein.  He stressed, however, that law enforcement did not have his consent to search the Buick.  (See id. at 116 (Corporal Morris stating as follows: "Mr. Taylor said that there was approximately 3,000 dollars in there, but we weren't getting in his car, and the conversation ended.")).

Corporal Morris phoned Patrolman Clarence Howell. Patrolman Howell is an officer with the K-9 unit.  Prior to his arrival, Detective Daniels "permeated" the Buick.  (Id. at 65). The process involves a physical entry into the vehicle by law enforcement, rolling up its windows, turning off the ignition but leaving the key in the "on" position, and then turning on the vehicle's interior fan to blow any aromas in the vehicle out to the exterior.  This appears to be a standard practice for the Charleston Police Department when the K-9 unit is called.  (See Trans. at 66 (Detective Daniels stating "And as far as my experience, every other K-9 officer that I've dealt with, they have you permeate the car is what they call it like I described to you before their arrival."); (id. at 86 (Patrolman Howell noting that his K-9 supervisor trained him that "when you conduct a traffic stop, we permeate the vehicle.")).

4

Patrolman Howell reiterated that one must enter the
detained vehicle in order to permeate it.  There are no state or
national standards respecting permeation and Patrolman Howell
has never read nor received any literature concerning the
process.  Interestingly, Patrolman Howell suggested that
permeation was unnecessary for an effective K-9 sniff.  He
testified as follows: "On some of our training we do
unpermeated, some we do permeated, and he detects unpermeated
and permeated."  (Id. at 88; see also id. at 91).[2]  When asked
why permeation is performed if it is unnecessary for finding
contraband, Patrolman Howell responded "That's what I do. If
it's available, we permeate the vehicle. If he has a key and
they state they have a key, we permeate the vehicle."  (Id. at
91).

Patrolman Howell arrived with his K-9, Jux, and
commenced an exterior search of Mr. Taylor's vehicle a short
time later.  Detective Daniels characterized the sniff as the
"moment of truth."  (Id. at 59).  If an alert occurred, the

---

[2] Patrolman Howell dispelled any doubt on the point later in his
testimony as follows:

    Q. Does this permeation, it increases the chances that
    K-9 Officer Jux will provide a positive alert?

    A. It don't increase the chances.

(Id. at 94).

investigation would continue.  If Jux failed to alert, the officers would have returned Mr. Taylor's driver documents, issued a warning citation for reckless driving, failure to maintain his lane, or driving too fast for conditions and sent Mr. Taylor on his way.  After Jux alerted, Detective Daniels and Corporal Morris approached the vehicle to search it.

Corporal Morris opened the glove compartment and retrieved the currency.  Detective Daniels searched underneath the driver's seat and saw a handgun.  He alerted Corporal Morris.  Mr. Taylor confirmed that he was on federal probation for a prior drug charge, in actuality a term of supervised release.  The officers informed Mr. Taylor that he was under arrest for being a felon in possession of a firearm.  Corporal Morris searched Mr. Taylor's person following his arrest, finding two large wads of currency in each front pocket.  He was placed in a nearby cruiser.  Corporal Morris continued the search, moving to the Buick's trunk.  There he found a duffel bag.  He unzipped it and saw a large grocery-type bag full and tied at the top.  He looked closer and saw additional stacks of currency.  The total amount of currency recovered was $93,157.

On November 15, 2012, the United States filed a single-count indictment charging Mr. Taylor with possessing the recovered firearm after having previously been convicted in 2005

of possessing with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). On December 13, 2012, Mr. Taylor moved to suppress all fruits of the October 24, 2012, traffic stop. First, he asserted that the officers lacked probable cause to stop him. Second, he contends that law enforcement exceeded the customary scope of a traffic stop and instead pursued a criminal investigation that measurably prolonged the stop without reasonable suspicion. The May 14, 2013, memorandum opinion and order rejected Mr. Taylor's challenges on these two points.

On December 27, 2012, Mr. Taylor filed a supplemental motion to suppress. Relying upon United States v. Jones, 132 S. Ct. 945 (2012), he asserted that the permeation of his vehicle resulted in an impermissible trespass in violation of the Fourth Amendment. On January 14, 2013, Mr. Taylor filed a second supplemental motion to suppress. He asserts that Jux did not alert during the sniff contrary to Patrolman Howell's testimony.

On January 22 to January 24, 2013, the court held an evidentiary hearing attended by counsel for the parties and Mr. Taylor. On February 1, 2013, Mr. Taylor moved to file additional briefing and to supplement the record. On February 4, 2013, the court permitted the parties to file additional

7

briefing respecting the mobile phone records at issue in the case, with the final brief arriving on February 15, 2013.

On February 26, 2013, after having not earlier received a substantive response from the United States respecting Mr. Taylor's February 6, 2013, brief, the United States was directed to file a substantive response on or before March 11, 2013, with any response from Mr. Taylor filed by March 18, 2013. On March 18, 2013, the final brief was received, and the court deemed the matter submitted.

On March 26, 2013, the Supreme Court entered its decision in <u>Florida v. Jardines</u>, 133 S. Ct. 1409 (2013), which, in combination with the recent decision in <u>United States v. Jones</u>, 132 S. Ct. 945 (2012), bore directly upon the issues under consideration in this action. The court noted that the United States had not responded to Mr. Taylor's earlier invocation of <u>Jones</u>. Accordingly, on April 3, 2013, the court directed the parties to submit cross briefs no later than April 12, 2013, respecting the application of both <u>Jones</u> and <u>Jardines</u> to this matter, with responses thereon filed no later than April 19, 2013. Those dates were extended, at the United States' request, to April 16, 2013, for cross briefs and April 21, 2013, for responses.

On May 14, 2013, the court entered its findings of fact and conclusions of law.  In sum, the warrantless entry into Mr. Taylor's vehicle, resulting in an unreasonable search, was deemed to transgress the Fourth Amendment boundaries recently discussed in Jones and Jardines.  Noting that the parties had not briefed the remedy, if any, that should result, the United States was given leave to address the question by May 28, 2013, with Mr. Taylor's response by June 11, 2013, and the United States' reply, if any, filed by June 18, 2013.  The court has received the United States' opening brief and Mr. Taylor's response.  At the court's direction, the United States filed a reply on July 12, 2013.

II.

The court discussed Jones and Jardines in the May 14, 2013, memorandum opinion and order.  In Jones, law enforcement installed a Global-Positioning-System ("GPS") tracking device on the undercarriage of the defendant's Jeep while it was stationed in a public parking lot.  The device was then used over the next 28 days to track the vehicle.  The fruits of that tracking effort produced a grand jury indictment resulting in the defendant's ultimate conviction.  The Supreme Court concluded that the "installation of a GPS device on a target's vehicle,

and . . . [the] use of that device to monitor the vehicle's
movements, constitutes a 'search'" within the meaning of the
Fourth Amendment.  <u>Id</u>. at 949.  The Supreme Court observed as
follows:

> It is important to be clear about what occurred in this
> case:  The Government physically occupied private
> property for the purpose of obtaining information. We
> have no doubt that such a physical intrusion would have
> been considered a "search" within the meaning of the
> Fourth Amendment when it was adopted.

<u>Jones</u>, 132 S. Ct. at 949.  In arriving at its conclusion, the
majority opinion referenced the decision rendered decades
earlier in <u>New York v. Class</u>, 475 U.S. 106 (1986).  In <u>Class</u>,
the Supreme Court "concluded that an officer's momentary
reaching into the interior of a vehicle did constitute a
search."  <u>Jones</u>, 132 S. Ct. at 952 (describing the holding in
<u>Class</u>).

        In <u>Jardines</u>, law enforcement took a trained K-9 to
Jardines' front porch.  The K-9 alerted for narcotics.  A
warrant was obtained based upon the alert.  The ensuing search
revealed marijuana plants.  The question in <u>Jardines</u> was whether
the use of the K-9 on the homeowner's porch to investigate the
contents of the home constituted a "search" within the meaning
of the Fourth Amendment.  The Supreme Court observed as follows:

> <u>Th[e] principle [from Jones] renders this case a</u>
> <u>straightforward one</u>. The officers were here gathering
> information in an area belonging to Jardines and

> immediately surrounding his house -- in the curtilage
> of the house, which we have held enjoys protection as
> part of the home itself. And they gathered that
> information by physically entering and occupying the
> area to engage in conduct not explicitly or implicitly
> permitted by the homeowner.

Id. at 1414 (emphasis added).

In the May 14, 2013, memorandum opinion and order, the court found that Mr. Taylor explicitly prohibited law enforcement from entering the Buick.  Detective Daniels nevertheless entered the Buick prior to Patrolman Howell's arrival but solely for permeation purposes.  As performed in accordance with the longstanding, and apparently heretofore unchallenged, permeation practices of the Charleston Police Department, he additionally rolled up the vehicle's windows, turned the key to the "on" position, and then energized the interior fan.

The purpose of this step was to blow any aromas in the vehicle out toward the exterior, where Jux would soon be sniffing.  As the court earlier concluded, this warrantless entry and search is legally indistinguishable from the circumstances in Jones and Jardines, with law enforcement physically occupying private property -- Mr. Taylor's car -- for the purpose of obtaining information -- the otherwise undetectable, or less easily detected, odors of controlled

11

substances -- found therein.  Inasmuch as probable cause was
lacking for that unreasonable search, a Fourth Amendment
violation occurred.


                              III.


A.   Governing Standard


        Having found the entry into Mr. Taylor's car to
constitute an unreasonable search, the question of a remedy
remains.  As recently noted by the Supreme Court, "The Fourth
Amendment protects the right to be free from 'unreasonable
searches and seizures,' but it is silent about how this right is
to be enforced."  <u>Davis v. United States</u>, 131 S. Ct. 2419, 2423
(2011).  The Supreme Court has created the exclusionary rule to
serve that purpose, which, if applied, "bars the prosecution
from introducing evidence obtained by way of a Fourth Amendment
violation."  <u>Id.</u>

        When a Fourth Amendment violation is found, the
exclusionary rule is frequently employed.  <u>See</u>, <u>e.g.</u>, <u>United
States v. Oscar-Torres</u>, 507 F.3d 224, 227 (4th Cir. 2007)
("Indisputably, suppression of evidence obtained during illegal
police conduct provides the usual remedy for Fourth Amendment

                              12

violations.") (citing <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961));

<u>See</u> <u>United States v. Jones</u>, 678 F.3d 293, 305 (4th Cir. 2012)

("[A]s we have explained, 'the exclusionary rule is our sole

means of ensuring that police refrain from engaging in the

unwarranted harassment or unlawful seizure of anyone,'

regardless of where that person resides or visits.")  (quoting

<u>United States v. Foster</u>, 634 F.3d 243, 249 (4th Cir. 2011));

<u>United States v. Doyle</u>, 650 F.3d 460, 466-67 (4th Cir. 2011)

("Ordinarily, when a search violates the Fourth Amendment, the

fruits thereof are inadmissible under the exclusionary rule, 'a

judicially created remedy designed to safeguard Fourth Amendment

rights generally through its deterrent effect.'") (quoting

<u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974)).

      There are exceptions to the rule.  Suppression is "not

a personal constitutional right," nor seen as "redress" for the

constitutional wrong done.  <u>Id.</u> at 2426 (quoting <u>Stone v.

Powell</u>, 428 U.S. 465, 486 (1976)).  The focus is deterrence,

namely, preventing future Fourth Amendment violations.  The

Supreme Court in <u>Davis</u> treated the deterrent purpose at length:

> Real deterrent value is a "necessary condition for
> exclusion," but it is not "a sufficient" one. The
> analysis must also account for the "substantial social
> costs" generated by the rule.  Exclusion exacts a heavy
> toll on both the judicial system and society at large.
> It almost always requires courts to ignore reliable,
> trustworthy evidence bearing on guilt or innocence. And
> its bottom-line effect, in many cases, is to suppress

the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort."  For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

We abandoned the old, "reflexive" application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. In a line of cases beginning with <u>United States v. Leon</u>, we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue.

The basic insight of the <u>Leon</u> line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, . . . or when their conduct involves only simple, "isolated" negligence, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way."

<u>Id.</u> 2426-28 ("Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'")(quoting <u>United States v. Janis</u>, 428 U.S. 433, 454 (1976)).

So exclusion is considered when police practices are deliberate enough to result in "meaningfu[l]" deterrence and "culpable enough to be "'worth the price paid by the justice system.'"  <u>Id.</u> at 2428 (quoting <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009)).  For example, the Supreme Court in <u>Davis</u>, where police had relied on binding precedent, declined the harsh

14

remedy of exclusion inasmuch as "[t]he officers who conducted
the search did not violate Davis's Fourth Amendment rights
deliberately, recklessly, or with gross negligence" nor did the
"case involve any 'recurring or systemic negligence' on the part
of law enforcement."  <u>Id.</u> at 2429 ("We have stated before, and
we reaffirm today, that the harsh sanction of exclusion 'should
not be applied to deter objectively reasonable law enforcement
activity.'"); <u>see also</u> <u>United States v. Baker</u>, 719 F.3d 313,
320-21 (4th Cir. 2013) (noting <u>Davis</u> "extended the 'good faith'
exception to the exclusionary rule to hold that '[e]vidence
obtained during a search conducted in reasonable reliance on
binding precedent is not subject to the exclusionary rule.'").
The court reached a similar conclusion in <u>Herring</u> where police
relied on the records of a neighboring county that erroneously
indicated an arrest warrant was outstanding.

        Our court of appeals has recently had occasion to
apply the principles espoused in <u>Herring</u> and <u>Davis</u> in <u>United</u>
<u>States v. Davis</u>, 690 F.3d 226 (4th Cir. 2012), where it
summarized the inquiry as follows:

        In determining the deterrent effect of applying the
    rule, the <u>Herring</u> Court explained that the deterrent
    effect is higher where law enforcement conduct is more
    culpable. Thus, "'an assessment of the flagrancy of the
    police misconduct constitutes an important step in the
    calculus' of applying the exclusionary rule."

The *Herring* Court explained that the rule should not be applied where excluding the evidence would have little deterrent effect on future constitutional violations by law enforcement officers, and the cost to society of such a rule is high. *Id.* at 147-148, 129 S.Ct. 695 (concluding that "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way'" and the exclusionary rule should not be applied).

*Id.* at 251-52 (citations omitted) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.")(internal quotation marks and citation omitted).  As noted by the court of appeals in *Davis*, those instances when the exclusionary rule is applied are situations where law enforcement actions are "'patently unconstitutional' . . . [on the order of] brazen or reckless." *Id.* at 256 (citation omitted); *see also United States v. Gaines*, 668 F.3d 170, 178 (4th Cir. 2012) (Niemeyer, J., dissenting) ("The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possible dangerous defendants go free -- something that 'offends basic concepts of the criminal justice system,'" and the application of the rule is only proper 'where its deterrence benefits outweigh its substantial social costs . . . .'") (citations omitted).

Where there is little to suggest a pattern of constitutional wrongdoing and little likelihood of future

recurrences, the deterrent capacity of the exclusionary rule is diminished.  Compare, e.g., United States v. Davis, 690 F.3d at 256 ("We have no proof before us showing that victims' DNA profiles or individuals cleared of suspicion in an investigation are routinely entered into the local database by . . . [Prince George's County Police Department], or have been entered into the database in any other instance. There is nothing in the record to suggest that the acts here are likely to reoccur."), with United States v. Edwards, 666 F.3d 877, 886 (4th Cir. 2011) ("As the Supreme Court explained in Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), 'the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The . . . circumstances . . . demonstrate conduct plainly within the . . . exclusionary rule.  [T]he circumstances under which Edwards was searched are likely to recur. Indeed, the evidence in this case showed that Baltimore City police officers conduct searches inside the underwear of about 50 percent of arrestees, in the same general manner as the strip search performed on Edwards.'").

B.   Analysis

        The court has concluded that the permeation process offends the Fourth Amendment.  While the court in its preceding

opinion drew upon <u>Jones</u> and <u>Jardines</u> to simplify the analysis, the principle underlying the conclusion has been the law for decades.  Almost 90 years ago in <u>Carroll v. United States</u>, 267 U.S. 132 (1925), the Supreme Court, in carving out a limited exception to the warrant requirement of the Fourth Amendment, stated as follows respecting vehicle searches:

> [T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption <u>or search</u> unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

<u>Carroll</u>, 267 U.S. at 154 (emphasis added).

In the decades following <u>Carroll</u>, the Supreme Court excepted a few situations from the strict rule of probable cause.  <u>See</u>, <u>e.g.</u>, <u>Class</u>, 475 U.S. at 117; <u>Michigan v. Long</u>, 463 U.S. 1032 (1983) (search of passenger compartment for weapons may be based on reasonable suspicion); <u>New York v. Belton</u>, 453 U.S. 454 (1981) (search of passenger compartment allowed as search incident to arrest).  The 1986 decision in <u>Class</u> is instructive here.

In <u>Class</u>, the Supreme Court "concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."  <u>Jones</u>, 132 S. Ct. at 952 (describing the

18

holding in Class).  The Supreme Court in Class stated as
follows:

> While the interior of an automobile is not subject to
> the same expectations of privacy that exist with respect
> to one's home, a car's interior as a whole is nonetheless
> subject to Fourth Amendment protection from unreasonable
> intrusions by the police. We agree with the New York
> Court of Appeals that the intrusion into that space
> constituted a "search."

Class, 475 U.S. at 114-15.

The search in Class was nevertheless upheld as
reasonable based upon several considerations.  Foremost, law
enforcement could have commanded the defendant, while he was in
the car, to move the papers on the dashboard that covered up the
VIN inasmuch as the law required that the VIN not be obscured.
The high Court deemed the request of the driver not unlike the
permissible request for a license and registration.

Unlike a law enforcement officer's demand to see the
VIN, there is no corresponding requirement that one stopped by
the police obey the directive to energize his vehicle HVAC
system and roll up his windows.  Further absent from this case
is the incremental efforts of law enforcement in Class to secure
the VIN information without entering the vehicle.  For example,
one of the officers attempted to find the VIN on the jamb of the
open door, where it may be found in pre-1969 cars, prior to
reaching his arm in the vehicle to move the papers but could not

19

locate it there.  In this case, Mr. Taylor specifically
instructed law enforcement it was not permitted to enter his
car.  But that entry followed, along with the manipulation of
vehicle controls, and plainly transgressed the Fourth Amendment
in the process.  In arriving at that conclusion, one need look
no further than the jurisprudential line-in-the-sand found at
the conclusion of <u>Class</u>:

> We note that our holding today does not authorize police
> officers to enter a vehicle to obtain a dashboard-
> mounted VIN when the VIN is visible from outside the
> automobile.  <u>If the VIN is in the plain view of someone
> outside the vehicle, there is no justification for
> governmental intrusion into the passenger compartment to
> see it</u>.

<u>Class</u>, 475 U.S. at 119 (emphasis added).

One finds similar guidance in <u>United States v. Bond</u>,
529 U.S. 334 (2000).  In <u>Bond</u>, the Supreme Court addressed a
decidedly less intrusive examination of another Fourth Amendment
"effect," namely, a piece of luggage.  A law enforcement agent
walking through a bus proceeded to squeeze soft luggage placed
in the overhead storage space by passengers.  When he squeezed
the defendant's luggage, he felt a "brick-like" object.  After
receiving consent to open the bag, a brick of methamphetamine
was discovered.

After observing that "[p]hysically invasive inspection
is simply more intrusive than purely visual inspection," <u>id.</u> at

337, Chief Justice Rehnquist, writing for a 7-2 court majority, stated as follows:

> When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. Thus, a bus passenger clearly expects that his bag may be handled. He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner. But this is exactly what the agent did here. We therefore hold that the agent's physical manipulation of petitioner's bag violated the Fourth Amendment.

Id. 338-39. If the physical manipulation of the exterior of the Fourth Amendment "effect" in Bond was deemed unlawful when done to reveal evidence of unlawful activity, it is readily ascertainable that a more intrusive manipulation, occurring inside an effect otherwise cordoned off by the probable cause standard, would likewise offend the Constitution. See, e.g., 1 Joseph G. Cook, Constitutional Rights of the Accused 3d § 4:10 (3rd ed. 2013) ("It is axiomatic when applying the plain view exception to the warrant requirement that the government show that the officer was legitimately in a position to make the observation.") (emphasis added).[3]

---

[3]      There is one state case dealing with vehicle setup procedures. The facts, however, are dissimilar. In People v. Bartelt, 948 N.E.2d 52 (2011), a 4-3 majority concluded that, when viewed as a search rather than a seizure, it was permissible for law enforcement during a traffic stop to order the defendant to roll up her windows and turn on her ventilation fan to facilitate an exterior canine sniff. But see also United States v. Ladeaux, 454 F.3d 1107 (10th Cir. 2006) (ordering remand to consider in the first instance whether to suppress

Despite this rather concrete guidance, the Charleston Police Department adopted permeation, and an accompanying unwarranted vehicle entry, unsupported by probable cause, as a standard operating procedure. That course, at a minimum, gives rise to a finding of systemic negligence or recklessness. The pattern and practice here carries a far darker hue of culpability than a mere nonrecurring error respecting the scope of the law. Absent suppression, the court has little reason to conclude that the unconstitutional practice of permeation will cease. If the recovered weapon in this case is excluded, however, the price of permeation will be unmistakable.

There is thus undoubtedly a strong deterrent effect in suppressing the fruit of the search. Such a ruling exacts a heavy toll on the judicial system and society. The nature of the unconstitutional practice, however, and the effect that a suppression order will have on discouraging its future use, also redounds to the public good inasmuch as this type of longstanding Fourth Amendment violation will come to an end.

---

evidence obtained during traffic stop based on officer's request that vehicle's windows be closed and its vents be opened. Specifically, the district court was directed to consider whether the request required compliance or merely solicited cooperation). One distinguished commentator appears to take a dim view of the result in Bartelt. See 1 Wayne R. LaFave, Search & Seizure § 2.2(a) (5th ed. 2012).

The court, accordingly, ORDERS that Mr. Taylor's December 13, 2012, and January 14, 2013, motion and second supplemental motion to suppress be, and hereby are, denied.  It is further ORDERED that the December 27, 2012, supplemental motion to suppress evidence be, and hereby is, granted to the extent that the firearm seized and any photographs or other depictions thereof be, and hereby are, excluded from the evidentiary record to be developed during the trial of this case.

The Clerk is directed to transmit a copy of this written opinion and order to the defendant and counsel of record.

ENTER: August 12, 2013

John T. Copenhaver, Jr.
United States District Judge